**MICHAELS LAW GROUP, APLC**
A Professional Law Corporation
Jonathan A. Michaels, Esq. – State Bar No. 180455
Dana M. Heyde, Esq. – State Bar No. 247142
2801 W. Coast Highway, Suite 270
Newport Beach, CA 92663
Telephone: (949) 581-6900
Facsimile: (949) 581-6908
jmichaels@michaelslawgroup.com
dheyde@michaelslawgroup.com

**WEILAND, GOLDEN, SMILEY, WANG EKVALL & STROK, LLP**
Jeffrey Golden, Esq. – State Bar No. 133040
Hutchison B. Meltzer, Esq. – State Bar No. 217166
650 Town Center Drive, Suite 950
Costa Mesa, CA 92626
Telephone: (714) 966-1000
Facsimile: (714) 966-1002
jgolden@wgllp.com
hmeltzer@ wgllp.com

Attorneys for J. Michael Issa, Chapter 11 Trustee

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION**

| | |
|---|---|
| In re CHINA AMERICAN COOPERATIVE AUTOMOTIVE, INC.<br><br>and<br><br>In re ZX AUTOMOBILE COMPANY OF NORTH AMERICA, INC.<br><br>Debtors. | Chapter 11<br><br>Case No. 8:08-bk-13065-TA<br><br>*Jointly Administered with*<br><br>Case No. 8:08-bk-13876-TA |
| J. MICHAEL ISSA, Chapter 11 Trustee,<br><br>Plaintiff,<br><br>vs.<br><br>EDWARD MICHAEL DASPIN, an individual; JOAN DASPIN, an individual; WILLIAM L. POLLACK, an individual; RONALD A. STELLA, an individual; SAM TROPELLO, an individual; BRADFORD P. SHAFFER, an individual; MICHELLE | **FIRST AMENDED COMPLAINT FOR:**<br><br>1. **AVOIDANCE OF INTENTIONAL FRAUDULENT TRANSFER UNDER 11 U.S.C. § 544 AND CAL. CIV. CODE § 3439.04(a)(1);**<br>2. **AVOIDANCE OF CONSTRUCTIVE FRAUDULENT TRANSFER UNDER 11 U.S.C. § 544 AND CAL. CIV. CODE § 3439.04(a)(2);**<br>3. **AVOIDANCE OF CONSTRUCTIVE FRAUDULENT TRANSFER UNDER 11 U.S.C. § 544 AND CAL. CIV. CODE § 3439.05;** |

1

**FIRST AMENDED COMPLAINT**

| | |
|---|---|
| SHAFFER, an individual; THE 1ST CAPITAL CORPORATION, a Delaware corporation; CAPITAL CORPORATION OF AMERICA, a Delaware corporation; DASPIN & CO., INC., a New Jersey corporation; PROPERTY DEVELOPMENT GROUP, INC., a Delaware corporation; DOES 1 through 25, inclusive,<br><br>                    Defendants. | 4. **AVOIDANCE OF FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548(a)(1)(A);**<br>5. **AVOIDANCE OF FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548(a)(1)(B);**<br>6. **RECOVERY OF AVOIDED TRANSFERS UNDER 11 U.S.C. § 550;**<br>7. **BREACH OF FIDUCIARY DUTY;**<br>8. **CONSPIRACY TO BREACH OF FIDUCIARY DUTY;**<br>9. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**<br>10. **FRAUD;**<br>11. **CONSPIRACY TO DEFRAUD;**<br>12. **AIDING AND ABETTING FRAUD**<br>13. **CONVERSION;**<br>14. **CONSPIRACY TO CONVERT;**<br>15. **AIDING AND ABETTING CONVERSION;**<br>16. **BREACH OF CONTRACT;**<br>17. **NEGLIGENCE;**<br>18. **BREACH OF CONTRACT;**<br>19. **FRAUD;**<br>20. **UNJUST ENRICHMENT; AND**<br>21. **ACCOUNTING** |

## STATEMENT OF JURISDICTION AND VENUE

1.  The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 323, 541(a), 544, 547, 548 and 550. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H).

2.  Venue properly lies in this judicial district in that the civil proceeding arises under title 11 of the United States Code as provided in 28 U.S.C. § 1409.

3.  This adversary proceeding arises out of and relates to the case entitled *In re China American Cooperative Automotive, Inc.* ("Chamco") and *In re ZX Automobile*

*Company of North America, Inc*. ("ZXNA" and collectively with Chamco, the "Debtors"), Chapter 11 cases currently pending in the United States Bankruptcy Court, Central District of California, the Honorable Ted Albert presiding. On June 3, 2008, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against ZXNA. Thereafter, on July 7, 2008 an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against Chamco. On December 23, 2008, this Court entered its orders in the Chamco and ZXNA cases granting the Settlement Motions ("Order Approving Settlement"), which included the orders for relief under Chapter 11 of the Bankruptcy Code. On January 7, 2009, in accordance with the Order Approving Settlement, motions to appoint J. Michael Issa as Chapter 11 trustee for the Debtors' estates were filed by the Office of the United States Trustee (the "Trustee Motions"). The Trustee Motions were granted by orders entered on January 9, 2009.

## PARTIES

4.      The Trustee, J. Michael Issa, ("Trustee" or "Plaintiff") is the duly appointed chapter 11 trustee for the Debtors' bankruptcy estates.

5.      Debtor China American Cooperative Automotive, Inc., referred to as "Chamco," is and at all times mentioned herein was, a corporation organized and existing under the laws of New Jersey.

6.      Debtor ZX Automobile Company of North America, Inc., referred to as "ZXNA," is, and at all times mentioned herein was, a corporation organized and existing under the laws of New Jersey.

7.      The Trustee is informed and believes that Defendant Edward Michael Daspin, referred to as "Mike Daspin," is an individual residing in the State of New Jersey. The

Trustee is further informed and believes that at all times relevant hereto, Mike Daspin was the *de facto* owner and operator of Chamco, ZXNA and Defendant The 1st Capital Corporation, and that he was the owner of Defendant Daspin & Co., Inc.

8. The Trustee is informed and believes that Defendant Joan Daspin is an individual residing in the State of New Jersey. The Trustee is further informed and believes that at all times relevant hereto, Joan Daspin was a shareholder of Chamco.

9. The Trustee is informed and believes that Defendant William L. Pollack is an individual residing in the State of New Jersey. The Trustee is further informed and believes that at all times relevant hereto, Pollack was a shareholder of Chamco, a member of Chamco's board of directors, and a shareholder of Defendant The 1st Capital Corporation.

10. The Trustee is informed and believes that Defendant Ronald Stella is an individual residing in the State of New Jersey. The Trustee is further informed and believes that at all times relevant hereto, Stella was a shareholder of Chamco, a member of Chamco's board of directors, a shareholder of Defendant The 1st Capital Corporation, and the nephew of Defendant Mike Daspin.

11. The Trustee is informed and believes that Defendant Sam Tropello is an individual residing in the State of New Jersey. The Trustee is further informed and believes that at all times relevant hereto, Tropello was a shareholder of Chamco, a member of Chamco's board of directors, and an officer of Chamco.

12. The Trustee is informed and believes that Defendant Bradford P. Shaffer is an individual residing in the State of California. The Trustee is further informed and believes

that at all times relevant hereto, Bradford P. Shaffer was the son-in-law of Defendants Mike and Joan Daspin, by virtue of his marriage to their daughter, Michelle Shaffer.

13. The Trustee is informed and believes that Defendant Michelle Shaffer is an individual residing in the State of California. The Trustee is further informed and believes that at all times relevant hereto, Michelle Shaffer was the daughter of Defendants Mike and Joan Daspin.

14. The Trustee is informed and believes that Defendant The 1st Capital Corporation is a corporation organized under the laws of Delaware. The Trustee is further informed and believes that at all times relevant hereto, The 1st Capital Corporation was owned by Defendants Pollack and Stella, but controlled by Defendant Mike Daspin.

15. The Trustee is informed and believes that Defendant Capital Corporation of America is a corporation organized under the laws of Delaware. The Trustee is further informed and believes that at all times relevant hereto, Capital Corporation of America was organized to serve as a successor to The 1st Capital Corporation and is also owned by Defendants Pollack and Stella, but controlled by Defendant Mike Daspin.

16. The Trustee is informed and believes that Defendant Daspin & Co., Inc., is a corporation organized under the laws of New Jersey. The Trustee is further informed and believes that at all times relevant hereto, Daspin & Co., Inc. is owned by Mike Daspin.

17. The Trustee is informed and believes that Defendant Property Development Group, Inc. is a corporation organized under the laws of Delaware. The Trustee is further informed and believes that at all times relevant hereto, Property Development Group was owned by Defendants Joan Daspin and Ron Stella, and non-party Bob Sweeney.

18. The Trustee is unaware of the true names of Does 1 through 25 and therefore sues them by such fictitious names, and he will ask for leave of court to insert their true names when such have been ascertained. The Trustee is informed and believes that each of the Defendants was and is the partner, agent, servant, employee, representative and/or alter ego of each of the remaining Defendants, and that each was acting within the scope of his or her authority as such partner, agent, servant, employee, representative and/or alter ego with the actual or ostensible permission and consent of the remaining Defendants.

## **STATEMENT OF STANDING**

19. The Trustee has standing to bring this action pursuant to 11 U.S.C. §§ 105, 323, 544, 547, 548 and 550.

## **STATEMENT OF OPERATIVE FACTS**

20. The concept for "Chamco," formally known as "China America Cooperative Automotive, Inc.," began in 2004-05 when two individuals named Hap Hirsh and Lou Small consummated a deal with Chinese car manufacturer Hebei Zhongxing Automobile Company, Ltd., referred to as "ZX Auto," for the importation of Chinese cars to the United States. Lacking sufficient funding to bring this deal to fruition, Hirsh and Small were introduced to Defendant Mike Daspin as someone who could help them with funding for the operation. Although Hirsh and Small were unaware of it, Mike Daspin was a convicted felon – having been found guilty of committing bankruptcy fraud – who was masterful at devising extremely complex schemes to defraud people of their money.

21. After Hirsh and Small met with Mike Daspin, the three of them traveled to China to meet the Chinese car manufacturer, ZX Auto. Upon meeting the ZX Auto executives, Daspin ingratiated himself with the Chinese company, as he saw an opportunity to deal directly with ZX Auto and to cut Hirsh and Small out of the venture. When Daspin returned to the U.S., he decided to form his own company that would do business with ZX Auto, and he secretly formed his own "Chamco" in New Jersey in January 2006 to steal the ZX Auto relationship. Daspin also formed a company called ZX Automobile Company of North America, Inc., commonly referred to as "ZXNA," which would serve as the North American distributor that would be wholly owned by Chamco.

22. In January 2006, Daspin succeeded in stealing the ZX Auto relationship from Hirsh and Small, when his new Chamco company and newly-formed ZXNA entered into an agreement with ZX Auto for the importation of Chinese cars to North America.

### *Mike Daspin's Control Over Chamco and ZXNA*

23. While Daspin organized and dominated Chamco and its subsidiary ZXNA, he went to great lengths to make it appear on paper as though he had no connection with the enterprise. He was not an officer, director, shareholder or employee of either of the entities. Instead, Daspin placed family members, "yes" men, and corporate shells in these positions, which allowed him to exert total dominion and control over the enterprise. Specifically, he placed his wife, Defendant Joan Daspin, as the majority shareholder of Chamco; he placed his nephew, Defendant Ron Stella, as a board member and shareholder; he placed Defendant Sam Tropello as the Chief Operating Officer and Director of Chamco; and he placed Defendant Bill Pollack as the Chairman of the Board. Together these individuals disseminated a multitude of different and inconsistent capitalization tables of Chamco stock, resulting in incomplete and contradictory corporate records reflecting the equity interests held in Chamco,

they backdated important contracts, and they forged officer's signatures when it was convenient or necessary to do so.

24.     Acting in concert with these individuals, Daspin demanded that Chamco employees report to him regarding their day-to-day business, and that all business decisions be presented to him for approval. This structure allowed Daspin to exert complete control over Chamco and ZXNA, where he could siphon off substantial amounts of money, while shielding himself from recourse for his fraudulent behavior. Daspin never had an intent to actually see Chamco or ZXNA succeed – only an intent to allow them to survive long enough for him to profit greatly. Then when the enterprises collapsed on themselves, Daspin could walk away claiming to be a stranger to the business. The reality, however, was that Daspin conducted himself as the *de facto* owner and operator of Chamco and ZXNA.

### *The Services Agreement Schemes*

25.     The underpinnings of Daspin's fraudulent control over Chamco and ZXNA is a "Services Agreement" that he caused Chamco to enter into with Defendant The 1st Capital Corporation in December 2006. [Exhibit "A"]. Daspin claims to only be a "consultant" to The 1st Capital Corporation, but this too is a lie. Just as he exerts total control over Chamco and ZXNA through the use of family members and yes men, Daspin placed Ron Stella and Bill Pollack as owners of The 1st Capital Corporation, which allowed him to have complete control over the company. Daspin then caused The 1st Capital Corporation to enter into a "Services Agreement" with his personal company, Defendant Daspin & Co., such that the funds received by The 1st Capital Corporation would be up-streamed to Daspin & Co., and ultimately to Mike Daspin himself. This Services Agreement was later assigned by Daspin to another entity he created called Defendant Capital Corporation of America. This new entity was also owned by Defendants Pollack and Stella, and controlled by Daspin.

8

**FIRST AMENDED COMPLAINT**

26. Under the Chamco / The 1st Capital Corporation Services Agreement, The 1st Capital Corporation was to find employees, raise money, and negotiate importation contracts for Chamco. In exchange, Chamco was required to pay The 1st Capital Corporation 25% of every Chamco employee's first year compensation, 10% of all money raised for Chamco, and 0.1% the value of Chamco's importation contracts. The Agreement also required Chamco to pay to The 1st Capital Corporation upon execution a "non-refundable" retainer of $80,000 per month, which would be credited against "future success fees." Daspin then had the December 2006 Agreement backdated to January 2006, and had Ron Stella falsify corporate records to make it appear as though the Agreement had been signed at that time, so that he could claim that Chamco already owed The 1st Capital Corporation $960,000 (12 months of revenue at $80,000 per month).

27. To further solidify the financial obligation from Chamco to The 1st Capital Corporation, Daspin unilaterally proclaimed that the ZX Auto contract for the importation of Chinese cars to North America had a "value" of $3.6 billion, and that because of this Chamco was obligated to pay The 1st Capital Corporation a fee of 0.1% of this valuation, or $3.6 million. However, this valuation was pure fiction that was not based on anything other than Daspin's imagination and greed.

28. In December 2006, Daspin also caused Chamco to enter into a Services Agreement with ZXNA, which was also backdated to January 2006, where money would be up-streamed from ZXNA to Chamco (in a similar way that money was to be up-streamed from Chamco to The 1st Capital Corporation). Under this Services Agreement, however, Daspin also caused Chamco to "guarantee" that ZXNA (a company that had been in existence for about a year) would earn "at least a minimum of $2.5 million in pre-tax profits" per year. It was immaterial to Daspin whether Chamco could ever actually perform on this obligation, since the default would be against Chamco, not himself; and the benefit of having such an obligation was

9

**FIRST AMENDED COMPLAINT**

that Daspin could tell potential investors that they couldn't possibly lose money because it was "guaranteed" that ZXNA would make at least $2.5 million per year.

29. Not surprisingly, in the time that has elapsed since the Service Agreements were executed, ZXNA never received any money under this "guaranty," and in fact, ZXNA never even had a company bank account.

### *The Material Misrepresentations in the PPMs*

30. After Daspin established the Chamco / ZXNA enterprise, he set out on a scheme to drag in money however possible. In 2006, Daspin, along with Defendants Bill Pollack and Sam Tropello and Ron Stella, began circulating a Private Placement Memorandum, known as a PPM, to any U.S. auto dealer who might be sold on the notion of investing $300,000 for an opportunity to become one of the first dealers to import Chinese cars to the U.S., with wild returns on their investment. In at least one of the PPMs, they claimed that this $300,000 investment was "expected to grow to $4.2 million of value by 2011...."

31. The PPMs were presented as being truthful discussions concerning the investment opportunity. In reality, however, the PPMs, which were tightly controlled by Daspin and Pollack, contained numerous material misrepresentations. For example, in the September 2006 PPM it showed that ZXNA had "cash on hand" of $27,100,000. In its entire existence, however, ZXNA and Chamco combined never raised anything close to this amount, much less had this much cash on hand.

32. In the January 2007 PPM, the material misstatements were even more significant, as reflected by the following examples:

**False Statement No. 1**

*"ZX Auto China is contractually obligated to begin shipping production-ready vehicle SUVs and pickups to the U.S. in October*

10
**FIRST AMENDED COMPLAINT**

> *2007, and ZX Auto Changchun China will follow in October 2008 with sedans."*

The Truth:

ZX Auto was not obligated to produce any cars at any certain time. In fact, it wasn't even obligated to sell any cars to Chamco whatsoever if a pricing mechanism could not be reached. There is no defined shipping date; the closest thing to one is in Annex A to the Technical Cooperation Agreement, which schedules ZX Auto's start of production only after ZXNA completes NHTSA safety compliance testing (by 9/14/07) and after ZXNA completes final EPA compliance testing (by 10/1/07). ZXNA never completed – indeed, never even started – either task. Moreover, Chamco did not have any contract for the importation of sedans; its only contract related to SUVs and trucks.

**False Statement No. 2**

> *"Chamco Auto will manage the startup period for each Subsidiary … Subsidiaries will earn a minimum of $2.5 million per year to retain its management agreement."*

The Truth:

By the time the January 2007 PPM, ZXNA should have already received a pre-tax profit of $2.5 million for the 2006 year. However, no profit has ever been paid to ZXNA.

**False Statement No. 3**

*In the ZXNA Income Statement, it indicates that it has <u>historical</u> 2006 Sales of $3,000,000, resulting in a Gross Profit of $1,500,000.*

The Truth:

ZXNA did not sell anything in 2006, nor could it have, as it had nothing to sell. Its only asset was a contract that gave it the *possibility* of importing cars to the U.S. at a much later date.

33.     When any of the legitimate board members attempted to stop Daspin, Pollack and Tropello from this conduct, they were berated, verbally abused, or just fired altogether. For instance, in January 2007 – at the time this PPM was being circulated – Walt

Brostowicz, Chamco's Chief Financial Officer, wrote the following emails, complaining of the conduct:

<ins>January 2, 2007 Email to Bill Pollack [Ex. 16]</ins>:

"The primary … and crucial … issue relates to corporate governance, or more precisely, the breach(es) of which, having arisen because of the incestuous" relationship 1st Cap … and related interested party(s) has imposed upon Chamco Auto.

This must be addressed ASAP!

Formally or informally, board members, certainly, and other partners, perhaps, must be fully apprised of the financial ramifications therefrom, as well as of the evidenced damage to dealer/investor relations … both as such regard committed dealer/investors and also potential ones.

Bill, these are serious matters that require the board's attention."

<ins>January 20, 2007 Email to the Chamco Board [Ex. 17]</ins>:

"Continued solicitation of potential Dealer/Investors, such as what is planned in San Antonio Texas this coming week, must cease until proper legal clarification with respect to outstanding investment criteria, equity ownership, and a myriad of governance issues … it is my recommendation that the event in San Antonio be cancelled …."

Eleven days after sending this last email, Walt Brostowicz was fired from Chamco without cause or explanation.

### ***The Property Development Group Transaction***

34.     As part of the window dressing to entice investors, Daspin, Pollack and Tropello hired and prominently advertised big names in the automotive industry, including Robert Wharen (President of Rolls Royce USA), Greg Romano (deputy director of New Jersey's securities commission), Steve Saleen (founder and CEO of Saleen, Inc.), and Thomas Del Franco (Chief Operating Officer of Audi USA).

35. When Thomas Del Franco was hired in late 2007, Daspin required him to purchase $451,500 of Chamco stock. As Daspin described it, having the employees purchase stock was a standard deal for his selection process, as everyone needed to have "skin in the game" (except, of course, Daspin, who purchased no stock in the company). In reality, however, this was just a way for Daspin to siphon off 10% of the employee's investment, along with 25% of their first year salary.

36. With the Del Franco deal, however, Daspin went one step further, and he instructed Del Franco to make the check payable not to Chamco, but to "Property Development Group" – an entity owned by Mike Daspin's wife, Joan Daspin (78%), his nephew Ron Stella (19.5%), and Daspin loyalist Bob Sweeney (2.5%). Daspin's plan was to have Joan Daspin, Stella and Sweeney use this transaction to sell their own Chamco stock, which would result in $334,561 (78% of $451,500) going directly to Joan Daspin.

37. When this transaction was discovered by Chamco CFO Tom Cornine, Daspin told him to "keep it quiet." Not knowing how to handle the situation, Tom Cornine told Phil Berwish, Chamco's in-house counsel, and the Chamco board at large that Daspin was attempting to steal corporate opportunities. Phil Berwish then proposed that The 1st Capital Corporation Services Agreement and Bill Pollack be terminated. When Daspin found out about this, he fired both Cornine and Berwish and he physically assaulted Phil Berwish, requiring the police to be summoned. This event resulted in Cornine and Berwish filing assault and wrongful termination charges against the company.

### *The Homologation of the Chinese Cars*

38. In mid-2007, Daspin hired niche vehicle manufacturer Steve Saleen to serve as the CEO of ZXNA and to "homologate" the cars for the United States – a process where the cars are certified to be compliant to U.S. Federal Motor Vehicle Safety Standards.

Given that the ZX Auto cars were generally manufactured for a third-world market, the process to get vehicles certified to a U.S. standard was a monumental task.

39.     Upon being hired, Steve Saleen and his team spent a considerable amount of time in China, attempting to understand what work needed to be completed to get the cars certified for the U.S. As Saleen began to understand in late 2007 the level of engineering that would be necessary to homologate the cars, he told Daspin and Pollack that there was no physical way that the cars could be ready for the U.S. by June 2008, as they had been publically stating. Saleen then told Daspin and Pollack that Purchase Orders needed to be placed to begin the homologation process, and that it would be a minimum of 18 months after Purchase Orders were issued before the cars could possibly be certified in the U.S. Hence, Saleen told them that if the Purchase Orders were issued then (late 2007), that they may be able to get the cars homologated by Spring 2009. Saleen also told Daspin and Pollack that based on the level of engineering that needed to be completed, the likely MSRP (Manufacturer Suggested Retail Price) for the cars would be $16,000 to $17,000, not the $13,500 figure that Daspin and Pollack had been using.

40.     Daspin and Pollack ignored Saleen's request to have the Purchase Orders placed, essentially halting all efforts to have the cars certified for the United States; yet they continued to tell potential investors and the press that cars would be available in the U.S. in June 2008 with an MSRP of $13,500. In January 2008, Saleen put his concerns in writing to Bill Pollack and Ron Stella:

> January 4, 2008 to Bill Pollack and Ron Stella [Ex. 22].
>
> "Please allow this to follow up on our conversations over the past few weeks. As we discussed, I agreed to memorialize our discussions and to put in writing the feelings I have over the recent communication that Bill had with Diana Kurylko of Automotive News, as well as other communications with other parties.

14

**FIRST AMENDED COMPLAINT**

> \* \* \*
> I am also concerned about the veracity of the statements being made to the press and others …. For instance, I have stated on numerous occasions in Board meetings and in revisions that I have made to the PPM that the U.S. homologation will not be completed by the summer of 2008, and that the earliest that it could happen would be the Spring of 2009.… [M]oreover, as I have also mentioned on numerous occasions, I believe that, based on the information that we all have, it is highly unlikely that the cars will be introduced at an MSRP of $13,500."

41.     Within seven days of receiving this correspondence, and knowing that the homologation process had been stalled because they refused to allow the Purchase Orders to be placed, Daspin and Pollack issued a press release stating that the cars were on target for 2008: "The company plans to begin importing the vehicles to North America in late 2008, after all safety and emissions requirements have been met and documented." This story was published in The Globe and Mail (1/14/08), Auto123.com (1/27/08), Business Week (1/23/08) and Reuters (1/23/08), with Bill Pollack being quoted extensively.

42.     Daspin and Pollack continued their misrepresentation into the January 2008 Detroit Auto Show, where they prepared an Investment Circular that was handed out to potential dealer-investors at the Auto Show that continued to misrepresent the nature of the business. Despite having been repeatedly told by Saleen and his staff that the cars would not be certified for the U.S. until at least the Spring of 2009, Daspin and Pollack stated in the Investment Circular that Saleen's homologation team "remain confident that Chamco Auto's SUVs and Pickups will be certified as compliant with U.S. standards in 2008, as scheduled." The Circular also used the $13,500 MSRP, and then concluded by forecasting that the company would sell <u>102,500</u> units in <u>2008</u>, with a resulting EBITDA of <u>$181,235,000</u>. Aside from the fact that the homologation process had been halted because the Purchase Orders had not been issued, and that the person responsible for certifying the vehicles had been emphatically saying that they would not be certified until sometime in 2009, this claim is also remarkable given that

15
**FIRST AMENDED COMPLAINT**

the Chinese car manufacturer, ZX Auto, was a relatively small manufacturer who had never produced more than 35,000 units annually for the entire world.

43.     Equally misleading are the Chamco financial statements that were prepared by Daspin and Pollack at this time. For instance, the January 31, 2008 balance sheet details an asset base of $99,571,843, which consists of $3.6 million in accounts receivable (however, it had not yet sold anything) and $35,000,000 of land and infrastructure (yet, it owned no land and no infrastructures).

### *The Vehicle Deposit Scheme*

44.     After receiving substantial dissent from several Chamco officers over the PPMs, Daspin found a new way to solicit money from potential dealers that made life much easier. Since the PPMs were such a source of controversy, Daspin decided to do away with the PPMs altogether and turn the $300,000 "investment in the company" into a $250,000 "deposit for cars." As Daspin and Pollack rationalized, because an "investment" was not being made they could dispense with a PPM altogether, and simply take in money. As Pollack noted in a January 28, 2008 email: "Now that our standard dealer intro package will – not – include a PPM (or NDA and SEC form), life gets much simpler."

45.     This drastic change in investment strategy raised great concern among the legitimate Board members. On January 26, 2008, Mario Ferla, a former head of GE Capital and the CEO of Chamco, wrote to Pollack:

> "I am concerned about the fact that we are sending to the press the new brochure which now contains a significant and material change to our current business model. It is my duty to inform you that this change bears an inordinate liability risk for the company and the Board members and the company officers.

16

**FIRST AMENDED COMPLAINT**

> I am referring to the new idea of taking deposits rather than selling stock of our company,
>
> I know you informed me of this change a few days ago; however, I was under the impression that we were going to have a Board meeting in very short order (and discuss about it) …"

46. Similarly, Billy Tally, the Chief Technical Officer of ZXNA, warned that National Highway Traffic Safety Administration ("NHTSA", which is the governing U.S. agency that regulates the certification of cars) would "react adversely" to the practice of taking deposits on cars that have never been certified for the U.S. Nevertheless, Daspin and Pollack ignored these concerns, and moved forward with their solicitation of deposits from dealers without ever seeking Board input, much less approval.

### *The Scott Thomason / Thomason Auto Group, LLC Investment*

47. While the PPMs and dealer deposit schemes were becoming a point of serious contention, Daspin had been working on yet another mechanism to solicit investments. Given that Chamco already had several dealers who had made investments in the company, he decided to divide the United States into several "districts" and then began offering regional distributorships. If a dealership for a portion of a city could garner $300,000, a regional distributorship that covered several states could generate a substantial investment.

48. In late 2007, Scott Thomason, a large dealer in the western United States, agreed to invest in what Daspin called the Western regional distributorship, so long as another co-investor also made a substantial investment in the distributorship. Daspin told Thomason that he would get his daughter Defendant Michelle Shaffer and his son-in-law Defendant Brad Shaffer to invest $7.5 million (through an entity they would create called Shaffer Auto Group, LLC) for a 22% stake in the enterprise, if Thomason would invest $10 million for a 28% interest. Thomason on behalf of Thomason Auto Group, LLC agreed and invested $6 million cash, with a pledge to invest another $4 million upon the happening of certain events.

17

**FIRST AMENDED COMPLAINT**

However, when Daspin drew up the agreement with his daughter and son-in-law, he added (without telling Thomason) that the Shaffers' investment could be made with cash, or with securities, with the thought being that the Shaffers would invest Chamco stock that would be given to them by Joan Daspin for their portion. [Exhibit "B"].

49. However, after Thomason Auto Group, LLC invested $6 million, the Shaffers never made their investment, and in fact, never even formed the Shaffer Auto Group entity. Nevertheless, Daspin sought to use this event as another marketing opportunity, as he instructed the Chamco sales people to lie about the transaction and tell potential investors that Thomason and the Shaffers invested $25 million for the distributorship.

## **FIRST CLAIM FOR RELIEF**

**Avoidance of Intentional Fraudulent Transfers**

**(By the Trustee on Behalf of Chamco and ZXNA and Against**

**Defendants Mike Daspin, Joan Daspin, William Pollack, Ronald Stella,**

**Sam Tropello, The 1st Capital Corporation, Capital Corporation of America,**

**Daspin & Co., Inc., and Property Development Group, Inc.)**

50. The Trustee re-alleges the foregoing paragraphs as though fully set forth herein. The Trustee brings this Claim for Relief to avoid intentionally fraudulently transferred property under 11 U.S.C. §§ 544(b) and California Civil Code §§3439.04(a)(1), 3439.07, and 3439.09(c).

51. The Trustee is informed and believes, and on that basis alleges, that the Debtors made transfers of their property to Defendants Mike Daspin, Joan Daspin, William Pollack, Ronald Stella, Sam Tropello, The 1st Capital Corporation, Capital Corporation of America, Daspin & Co., Inc., and Property Development Group, Inc. during the four-year